**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JAMES KERRIGAN,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| **v.** | |
| **OTSUKA AMERICA PHARMACEUTICAL, INC.; AND MARK ALTMEYER,** | **NO.  12-4346** |
| **Defendants.** | |

## <u>OPINION</u>

## I.    INTRODUCTION

In this employment action, Plaintiff James Kerrigan alleges that his former employer, Otsuka America Pharmaceutical, Inc. ("OAPI"), and Mark Altmeyer, OAPI's President and Chief Executive Officer, violated New Jersey's Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-3, by retaliating against him after he reported regulatory compliance issues that occurred when he was acting as "brand lead" for marketing the pharmaceutical drug Samsca.  Defendants argue that because Kerrigan failed in his responsibility to ensure his team's compliance with regulations and with OAPI's internal protocols, he cannot insulate himself from the legitimate adverse consequences of that failure simply by reporting the mistakes he failed to prevent and by labelling himself a whistleblower under CEPA.  Before the Court is Defendants' motion for summary judgment.

## II.    FACTUAL BACKGROUND

Kerrigan served as Senior Director of Global Marketing within the Patient and Branding Strategy group at OAPI.  JA 19.  As part of his job duties, Kerrigan acted as global "brand lead" for marketing the drug "Samsca", a brand name for tolvaptan.  JA 553, 555, 833.  As such, he managed his team's marketing efforts and was responsible for ensuring compliance with any

applicable laws regarding pharmaceutical marketing. JA 696, 833. In particular, Kerrigan and his team were required to follow OAPI's internal promotional review process, which involved running promotional material by the Promotional Review Committee ("PRC") so that the PRC could ensure that they were scientifically accurate, consistent with labeling, fair and balanced, and conformed to the Food, Drug and Cosmetic Act guidelines. JA 1-18, 834. In addition, Kerrigan was obligated to report any illegal or unethical behavior to human resources, legal affairs, an integrity hotline, or OAPI's Ethics, Quality & Compliance Department ("Compliance"). JA 834.

In February and June 2011, Kerrigan reported potential violations with respect to two incidents in which Samsca-related promotional material was published without prior review by the PRC. Specifically, Kerrigan reported potential compliance issues with respect to articles published on a website called "Today's Hospitalist" and in a newsletter run by a company called Premier. In February 2012, Kerrigan received a year-end rating of "Needs Improvement" and his bonus was reduced to eighty percent of target. In May 2012, Kerrigan's employment was terminated. Kerrigan argues that his rating, bonus reduction, and termination constitute adverse employment actions that were taken in retaliation for reporting the issues involving Today's Hospitalist and Premier Newsletter.

A.     *Today's Hospitalist*

On Wednesday, February 2, 2011, Regina Cavaliere, OAPI's Chief Compliance Officer, received a report that an article posted on the Today's Hospitalist website appeared to contain information relating to tolvaptan. JA 23. The article was problematic to Cavaliere for several reasons, including because it: (1) had not been reviewed by the PRC; (2) did not disclose OAPI's relationship with the research in the article; and (3) appeared to contain "off label" information about Samsca. *Id.*; JA 848. The following day, a member of OAPI's legal team emailed

Kerrigan and the OAPI employee on Kerrigan's team who was responsible for the Today's Hospitalist relationship, informed them of these issues, and instructed them to have the article taken down. JA 25, 848. Kerrigan's report called him at home to discuss the e-mail, which Kerrigan had not seen. JA 598-603. Following their discussion, she responded to the email stating that the Today's Hospitalist article was "independent" and that OAPI would "obviously not be able to control the editorial content of Today's Hospitalist moving forward." However, she and Kerrigan "discussed and agree[d] that there could be a perception that the content is somehow associated with Otsuka" and so she asked the journal to pull the article. JA 24. When Kerrigan returned to work he reported the issue to Behshad Sheldon, his supervisor, as well as OAPI's regulatory reporting department. JA 599, 622. Kerrigan also suggested that OAPI draft a letter to the Federal Drug Administration ("FDA") to determine if they needed to take any corrective action. JA 597.

OAPI conducted an internal investigation and in May 2011 reported the issue to the FDA. JA 29, 43. Among other things, the letters disclosed OAPI's findings that the Today's Hospitalist article "should have been treated as a promotional document under OAPI's policy" because it referred to tolvaptan and its use; was "required to be reviewed and approved" by the PRC but was not submitted to the PRC for review; did not comport with FDA regulations regarding product promotion in accordance with the label's approved indications; and did not "include appropriate safety information . . . as required." JA 30. Kerrigan testified that he had "no idea" why Today's Hospitalist "went out and published something without giving it to [OAPI] for review." JA 625.

Ultimately, the FDA did not take enforcement action against OAPI and OAPI took no disciplinary action against Kerrigan for the specific incident. JA 610. However, OAPI decided

to terminate for cause the employee responsible for the Today's Hospitalist relationship and another involved OAPI employee.[1]  JA 859.  Unbeknownst to Kerrigan, they both had reviewed the material before it was published: They were also dishonest during the course of OAPI's internal investigation about their pre-publication involvement with the article.

**B.**    *Premier Newsletter*

Following the Today's Hospitalist incident, Kerrigan became "concerned" about articles that appeared in Premier Newsletter, as those articles also contained information about tolvaptan and were published without PRC review.  JA 63, 656-57.  Kerrigan reported his concern to Sheldon, who reported the matter to Compliance.  In June, 2011, OAPI conducted an investigation from which it concluded that the Premier Newsletter articles were problematic because, among other reasons, they failed to disclose the financial relationships between the newsletters' Advisory Board and members of OAPI; failed to disclose the financial relationships between OAPI and contributors to the articles that reference tolvaptan; should have been treated as promotional documents under OAPI's policy; the individuals involved in the contractual agreements of the newsletters may have improperly believed that the lack of editorial contract removed them from OAPI's internal review processes; each newsletter was required to be reviewed by OAPI's PRC but were not subject to such review; and the articles did not include appropriate safety information as required by the regulations.  JA 59-60, 63, 466-69, 518-19.  After reporting the Premier Newsletter matter to the FDA, OAPI was required to send corrective communications to over 20,000 individuals explaining the mistake.  JA 62-69, 835.  Kerrigan was not disciplined following the incident.

---

[1] Ultimately, both were allowed to resign in lieu of termination.   JA 47-48.

### C.     *Plaintiff's End of Year Review and Compensation*

On January 11, 2012, Kerrigan and Cavaliere were asked to give a presentation on the corrective actions the Samsca team had taken to prevent additional compliance issues.  JA 134; 696-702.  Kerrigan reported that in 2011 seven investigations arose from the Samsca team, five of which resulted in a self-report by the company to the FDA.  Cavaliere reported that OAPI had spent over $600,000 investigating and addressing these issues.  JA 134-45, JA 852.  Senior leaders at OAPI expressed concern about the number and scope of compliance investigations into Samsca, and questioned Kerrigan's ability to lead the Samsca team.  JA 839.

On January 12, 2012, senior leadership at OAPI conducted a performance review process.  It included a step called "calibration," which was designed to ensure that employees at equivalent levels within the organization were rated consistently and fairly.  JA 489, 774, 861.  Given the many compliance issues with Samsca under Kerrigan's management, the leadership group "reached a clear consensus that Mr. Kerrigan had put the entire Company at risk by his lack of attention to detail, including specifically his lack of attention to compliance, and by his not being aware of what his Samsca team was doing and that his lack of ownership of the issues warranted an overall performance rating of 'Needs Improvement.'"  JA 840. [2]

Following the calibration meeting, Altmeyer, Cavaliere and a representative from Human Resources met to discuss next steps.  JA 863.  They decided to deny Kerrigan a salary increase and to reduce his bonus.   They also decided that Kerrigan would be given six months to find another job but, for reasons unclear in the record, did not tell Kerrigan.   They did, however, tell Kerrigan about the rating and pay decision and, in response to an inquiry from him, gave the

---

[2]     Prior to the meeting Sheldon, as Kerrigan's direct supervisor, had given him a rating of "Meets Expectations."  In her written review, she explained that she would have given Kerrigan a rating of "Exceeds Expectations" but marked him down for the compliance issues with Samsca.  JA 177.  Sheldon's rating was, however, rejected by human resources.  *See* JA 190.

rationale – "Compliance." JA 153. On March 5, 2012, after meeting with a representative from Human Resources to discuss his compensation, JA 203, emailed his wife that:

> . . . I was knocked down due to Samsca compliance issues. Told him I am confused since I followed SOP's and proactively brought up the compliance issues to my boss and regulatory/compliance when I identified them. I mentioned that I even have the dates. He said as brand lead I am responsible. I disagreed and again said I followed our policies and even came up with a plan to mitigate risk in the future. I asked him for examples of policies I had not followed and he did not have any.

JA 189. On March 12, 2012, when Altmeyer met with Kerrigan to give him his performance review, he explained that he believed Kerrigan was placing OAPI at risk by not knowing what his team was doing or paying enough attention to catch compliance issues before they occurred. JA 192, 837-38. Kerrigan response that "he could not have foreseen the events unfolding and that he was proactive in reporting," JA 192, was viewed by Altmeyer as an "attempt[] to deflect responsibility and to excuse his and his team's compliance failures, including his failure to appropriately supervise" his direct reports. JA 837.

### D. *Plaintiff's Termination*

On May 15, 2012, Cavaliere received information that Otsuka Pharmaceutical Europe Ltd. ("OPEL") was using the services of a consulting company owned by Kerrigan's wife, and that Kerrigan had helped his wife get the contract. JA 310. This raised concerns about a potential conflict of interest. *Id.* On May 17, 2012, Cavaliere requested that OAPI open an investigation. JA 311, 323. OAPI investigated the matter and concluded that Kerrigan engaged in eight categories of violations:

(1) Kerrigan failed to disclose a potential conflict of interest as required by the Code of Conduct and Business Ethics (the "Code");

(2) Kerrigan failed to follow his supervisor's direction to provide full disclosure of the potential conflict of interest with his wife's company;

(3) Kerrigan inappropriately disclosed to his wife confidential information of an OAPI vendor in violation of the Code, and his wife used the information to further her company's interests;

(4) Kerrigan failed to disclose additional, potential conflicts of interest when he failed to inform that he had personal relationships with two other individuals affiliated with his wife's company;

(5) Kerrigan provided inaccurate information during the investigation;

(6) Kerrigan potentially had involvement with his wife's company or its team members;

(7) Kerrigan failed to sign and return the "Fairness & Confidentiality Statement" and apparently discussed the ongoing investigation with other witnesses;

(8) Kerrigan's conduct and interactions with a vendor did not reflect sound business judgment and constituted unprofessional conduct with a vendor.

JA 331.  In May, 2012, OAPI fired Kerrigan.  JA 391.  Human Resources reported that at his exit interview Kerrigan was told that "Otsuka Executives had lost confidence and trust in [him] after a series of issues were investigated in which he left Otsuka at risk and did not comply with internal policies and practices."  *Id*.  Kerrigan subsequently filed this lawsuit.

## III.    LEGAL STANDARD

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotation marks omitted).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof."  *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).  A fact is material if it might affect the outcome of the suit under the governing law.  *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006).  "The reviewing court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor."  *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  However, to prevail on a motion for summary judgment, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the [non-movant].'"  *Jakimas v. Hoffmann-La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (quoting *Anderson*, 477 U.S. at 252) (alteration in *Jakimas*).  In other words, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact."  *Abington Friends Sch.*, 480 F.3d at 256 (citing *Celotex*, 477 U.S. at 322-26).

## IV.    DISCUSSION

Under CEPA, it is "unlawful for an employer to retaliate against an employee because the employee discloses an activity of the employer that the employee reasonably believes is in violation of a law or is fraudulent or criminal."  N.J. Stat. Ann. § 34:19-3(c).  A plaintiff who brings a cause of action under CEPA must establish that: (1) he reasonably believed that his employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he performed a 'whistle-blowing' activity described in N.J.S.A. 34:19–3c; (3) an adverse employment action was taken against him; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action."  *Hitesman v. Bridgeway, Inc.*, 93 A.3d 306, 318 (N.J. 2014).  A CEPA plaintiff may prove a causal connection through "inferences that the trier of fact may reasonably draw based on

circumstances surrounding the employment action. . . ." *Maimone v. City of Atlantic City*, 903 A.2d 1055, 1064 (N.J. 2006). In circumstantial evidence cases, New Jersey courts apply the burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. *Dominguez v. Costco Wholesale Corp.*, 356 F. App'x 611 (3d Cir. 2009) (citing *Fleming v. Corr. Healthcare Solutions, Inc.*, 751 A.2d 1035, 1041 (N.J. 2000)).

### A.    Prima Facie *Case*

In their motion for summary judgment, Defendants argue, *inter alia*, that Kerrigan cannot establish a *prima facie* case of retaliation under CEPA because there is no evidence of a causal link between his alleged whistleblowing activity and any adverse employment action. Under CEPA, "to demonstrate causation, a plaintiff must show that the 'retaliatory discrimination was more likely than not a determinative factor in the decision.'" *Robles v. U.S. Environmental Universal Servs., Inc.*, 469 F. App'x 104, 107 (3d Cir. 2012) (quoting *Donofry v. Autotote Sys., Inc.*, 795 A.2d 260, 271 (N.J. Super. Ct. 2001)). This is not a burden that can be met by speculation; a plaintiff must demonstrate a factual nexus between the protected activity and the retaliatory employment action. *Wheeler v. Township of Edison*, No. 06-5207, 2008 WL 1767017, at *9 (D.N.J. Apr.15, 2008); *Hancock v. Borough of Oaklyn*, 790 A.2d 186, 194 (N.J. Super. Ct. 2002). The temporal proximity of protected conduct and an adverse employment action is one circumstance that may support an inference of a causal connection. *Maimone*, 903 A.2d 1055, 1064 (citing *Romano v. Brown & Williamson Tobacco Corp.*, 665 A.2d 1139 (N.J. App. Div. 1995)).

Kerrigan alleges that an adverse employment action was taken against him in: (1) February 2012, when he received a negative performance review and was informed that he would not receive a salary increase and his bonus would be reduced; and, (2) May 2012, when he

was terminated.[3]  Kerrigan argues that these events occurred as retaliation for reporting the

Today's Hospitalist and Premier Newsletter compliance issues.  Defendants do not contest that

either event occurred; rather, they argue that OAPI had legitimate reasons for both Kerrigan's

negative performance evaluation and reduced compensation as well as for Kerrigan's ultimate

termination in May 2012.  Specifically, Defendants argue that Altmeyer and senior management

lowered Kerrigan's year-end review and compensation because they had lost faith in Kerrigan's

ability to perform his job functions, particularly in light of the compliance issues relating to

Samsca.  Defendants further argue that Kerrigan was terminated due to his failure to abide by

OAPI policies and procedures when he helped his wife obtain a contract with an affiliated

company.

Kerrigan has failed to raise a genuine issue of material fact as to whether he suffered an

adverse employment action because of protected activity.  As an initial matter, the timing of the

key events does not suggest retaliatory conduct.  Kerrigan reported the Today's Hospitalist and

Premier Newsletter issues in February and June of 2011.  Although two other employees

connected with the matter were told to resign shortly after the Today's Hospitalist incident,

Kerrigan does not assert that he suffered any adverse employment consequences at that time.

Instead, the alleged retaliatory acts Kerrigan identifies occurred in February and May of 2012,

approximately six months following the Premier Newsletter incident, and more than one year

following the Today's Hospitalist incident.  A six-month to one-year gap, without more, does not

---

[3]     Kerrigan also argues that he suffered an adverse employment action when Altmeyer concluded in February 2012 that he would terminate Kerrigan's employment within six months but did not inform Kerrigan as to this decision.  A decision to terminate an employee that does not result in an actual termination does not rise to the level of an adverse employment action.  *See, e.g.*, *Beasley v. Passaic Cnty.*, 873 A.2d 673, 684 (N.J. Super. 2005) ("The definition of retaliatory action speaks in terms of completed action.").  Although he does not argue it in his opposition papers, Kerrigan's Amended Complaint also alleges various instances in which Altmeyer berated, belittled, or subjected him to unfair pressure following the Today's Hospitalist and Premier Newsletter incidents.  Such acts do not constitute adverse employment actions.  *See Caver v. City of Trenton*, 420 F.3d 243, 256 (3d Cir. 2005) ("[U]nsubstantiated oral reprimands" and "unnecessary derogatory comments" are "not serious and tangible enough to constitute adverse employment actions.").

create an inference of causation. *See Leboon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2000) ("a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment").

The only other potentially relevant evidence Kerrigan points to in support of causation is Sheldon's testimony that there was an increase in public personal attacks on Kerrigan by Altmeyer following his reports.[4] However, even assuming that Altmeyer did "attack" Plaintiff following the compliance issues, there is no evidence that Altmeyer's attitude toward Kerrigan changed in any way because Kerrigan reported the compliance issues. To the contrary, all of the evidence supports Defendants' argument that the senior leadership lost faith in Kerrigan following the Today's Hospitalist and Premier Newsletter incidents because they believed those problems occurred due to Kerrigan's failure to pay attention to what his team was doing. In fact, Kerrigan's own deposition testimony confirms that Altmeyer was upset with Kerrigan because of the underlying compliance failure. When asked whether Altmeyer ever told him that he should not have reported the Today's Hospitalist and Premier Newsletter incidents, Kerrigan responded that "what [Altmeyer] kept saying to me" was that he "was angry that *my team* was putting the company at risk" and that Kerrigan and his team were "the only problems in this organization." JA 651 (emphasis added). In the absence of any record evidence that any of the decisionmakers involved in taking an adverse employment action against Kerrigan did so *because of* his protected activity, there is no material fact at issue with regard to causation. Accordingly, Plaintiff has failed to establish a *prima facie* case of retaliation under CEPA.[5]

---

[4]    Plaintiff also points to testimony that in 2010, OAPI received a report that Altmeyer was creating a hostile work environment for another employee, and that Kerrigan reported feeling similarly. This testimony is irrelevant to the causation consideration here as it occurred before Plaintiff allegedly reported the compliance issues.

[5]  Having concluded that Kerrigan failed to meet his burden on causation, the Court need not analyze whether he has established any of the other elements of his CEPA claim.

## B.    *Pretext*

Even assuming *arguendo* that Kerrigan could establish a *prima facie* case of causation, he has failed to raise a genuine issue of material fact that Defendants' reasons for taking action against him were pretextual.  To establish pretext, a plaintiff must point to "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action."  *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  Here, Defendants have presented ample evidence of legitimate, non-discriminatory reasons for the actions they took with respect to Kerrigan's employment.[6]

OAPI contends that Kerrigan's February 2012 "Needs Improvement" performance review and compensation reduction are both attributable to senior management's conclusion that his performance did not meet standards.  This conclusion is overwhelmingly supported by the documentary evidence, including in Kerrigan's OAPI Performance Evaluation summary notes, JA 203, 210; email correspondence between Kerrigan and Sheldon, JA 153; and numerous contemporaneous writings memorializing Kerrigan's conversations with Human Resources and Altmeyer concerning his review and compensation.  JA 179, 189, 192.  Kerrigan's own summary of his meetings in his final review provides a similar account.  JA 203.

Kerrigan has pointed to no evidence that would discredit Defendants' stated reasons for lowering his rating or compensation.  Kerrigan argues that Altmeyer treated him "as the scapegoat for compliance issues."  Opp'n at 8.  To prevail on his CEPA claim, however, it is insufficient to show that Altmeyer or anyone else at OAPI unduly blamed Kerrigan for the

---

[6]    In his opposition papers, Kerrigan takes issue with the fact that Defendants rely in part on signed affidavits submitted by OAPI employees that Kerrigan had elected not to depose during discovery.  At this stage in the litigation, it is incumbent upon Plaintiff to point to evidence that supports his case and given his failure to provide record cites that raise a dispute about the statements made in those affidavits, he has not rebutted the statements made therein.  *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 202 ("[S]ummary judgment is essentially 'put up or shut up' time for non-moving party; the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.") (citation omitted).

underlying compliance issues. Instead, Kerrigan must point to evidence that he was "scapegoated" because he *reported* those issues. In support of his argument, Kerrigan points to Sheldon's testimony that "after the issues with compliance," he "was the one to pay the price." JA 481. But Sheldon's testimony merely confirms that Kerrigan "paid the price" for compliance mistakes because they occurred under his leadership. *See* JA 503-04. At best, the record evidence indicates that Kerrigan vehemently disagreed with OAPI's assessment that the compliance issues were a reflection of his poor leadership, and that he personally believed he had fulfilled his job responsibilities by reporting the compliance issues. *See, e.g.*, JA 203, 683, 694. The record is clear, however, that OAPI management simply did not agree, and Kerrigan has failed to point to any evidence, aside from his personal feeling, that OAPI should not have held him responsible for his team's compliance failures. *See* JA 840. While it is true that watchdog employees are protected by CEPA, *see Lippman v. Ethicon, Inc.*, 119 A.3d 215, 230 (N.J. 2015), a plaintiff who is responsible for reporting regulatory violations must still satisfy the elements of a CEPA claim, including that his employer took retaliatory action because of the protected activity. Kerrigan has adduced no evidence from which a factfinder could infer such a conclusion and has, therefore, failed to establish a genuine issue of material fact that Defendants violated CEPA with respect to the February 2012 performance rating and compensation decision.

Similarly, Plaintiff has failed to establish pretext with regard to his termination in May 2012. Defendants argue that Kerrigan was terminated after OAPI uncovered evidence that he helped his wife secure a contract from an affiliated company. As set forth above, the documentary evidence again overwhelmingly supports Defendants' position. Although he does not articulate his argument in his opposing memorandum, Kerrigan appears to believe that OAPI's reasons for terminating him are pretextual because he had fulfilled his obligations under

company policy by "recogniz[ing] an uh-oh moment and ask[ing] his supervisor Behshad Sheldon if there was a conflict of interest" concerning his wife's company. Opp'n at 9. Plaintiff presumably surmises that because Sheldon advised that there would be no conflict "if there is sufficient clarity," his termination was unwarranted. *Id*. Once again, Kerrigan's argument can be distilled into a dispute as to whether he had fulfilled his job obligations and complied with company policy and whether OAPI's response was therefore appropriate. Again the record is clear that OAPI concluded that the Kerrigan had *not* provided sufficient clarity and therefore violated company policy, and Kerrigan has not pointed to any evidence that identifies any "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in Defendants' proffered reasons for their actions. Accordingly, Kerrigan has failed to identify any evidence that would raise a genuine issue of material fact with respect to his termination.

V.      CONCLUSION

        For the reasons stated above, judgment will be entered in favor of defendants with respect to Kerrigan's CEPA claim. An appropriate order will follow.

                                        BY THE COURT:

                                        /s/ Wendy Beetlestone
                                        _____
                                        WENDY BEETLESTONE, J.